UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

RANDOLPH SEWELL, DAPHNE SEWELL,
MOSES ESHKENAZI, THERESE ESHKENAZI,
and HENRIETTE ESHKENAZI,
individually and on behalf of all
others similarly situated,

                 Plaintiffs,

vs.                    Case No. 2:07-cv-343-FtM-29SPC


D'ALESSANDRO & WOODYARD, INC., a
Florida for profit corporation;
GATES, D'ALESSANDRO & WOODYARD, LLC,
a Florida limited liability company;
K. HOVNANIAN FIRST HOMES, LLC, a
Florida limited liability company;
FIRST HOME BUILDERS OF FLORIDA, a
Florida general partnership; FIRST
HOME BUILDERS OF FLORIDA I, LLC, a
Florida limited liability company;
JAN BAILLARGEON, as Personal
Representative of the Estate of
Frank D'Alessandro, deceased; SAMIR
CABRERA, an individual; HONORA
KREITNER, an individual; BRUCE A.
ROBB, an individual; and PATRICK
LOGUE, an individual,

                 Defendants.

_____

## OPINION AND ORDER

    This matter comes before the Court on eight motions to dismiss. In an Opinion and Order (Doc. #203) filed on September 29, 2008, the Court dismissed plaintiffs' First Amended Class Action Complaint (Doc. #82) for non-compliance with Federal Rule of Civil Procedure 9(b), but granted "one final opportunity" for plaintiffs to file an amended complaint. Plaintiffs have now filed

their Second Amended Class Action Complaint (Doc. #205), to which all defendants have again filed motions to dismiss (Docs. ## 257, 258, 259, 260, 261, 263, 264, 265).    Plaintiffs filed a consolidated Response (Doc. #273) to all motions, and Replies (Docs. ## 283, 285) were filed by some of the defendants.

## I. The Second Amended Complaint

The Second Amended Class Action Complaint ("Second Amended Complaint") (Doc. #205) alleges that in 2003, defendants First Home Builders[1] and D&W[2] devised an investment scheme in which the two companies would sell new houses to be constructed by First Home Builders in Cape Coral and Lehigh Acres, Florida.  These new houses were sold as having been "pre-leased" to tenants, and the targeted investors were low-to-middle-income persons eager for double-digit returns (which were represented to be in excess of fourteen percent (14%)).  Potential investors were recruited throughout the United States in person, by mail, and through the presentation of traveling "road shows."  The typical sales pitch included the following representations: that a "ready-made" tenant, procured through the sole efforts of First Home Builders and D&W, would immediately occupy a house built by First Home Builders upon completion of construction; that the tenant would rent, and

---

[1] Defendants First Home Builders of Florida and First Home Builders of Florida I, LLC are collectively referred to as "First Home Builders" in the Second Amended Complaint (Doc. #205, ¶11).

[2] Defendant D'Alessandro & Woodyard, Inc.

ultimately purchase, the house from the investor, resulting in the promised fourteen percent (14%) rate of return; that the targeted investor would only be required to make a small down payment and to enter into a construction loan agreement, the interest on which First Home Builders would pay until construction of the house was completed; that once construction was completed, the investor would be required to convert the interim construction financing to permanent financing, if qualified; and that the investor would not incur any additional costs or expenses other than the minimal initial down payment.

An offering document titled, "First Home Lease Purchase Investment Opportunity" (the "Prospectus"), was given to prospective investors. This guaranteed an annual rate of return of fourteen percent (14%) based upon the leasing and eventual resale of the properties to third parties, which would be achieved solely through the efforts of First Home Builders and D&W. The provision of ready-made tenants and a guaranteed rate of return artificially inflated the values of the properties, which made them more profitable to sell than unoccupied properties. This Prospectus was the template for the representations made by defendants to potential investors.

Defendants First Home Builders, D&W, D'Alessandro,[3] Cabrera,[4] and Kreitner[5] marketed thousands of these real estate investment properties to investors throughout the United States as part of a common promotional plan. This common promotional plan involved the same developer (First Home Builders) executing each contract of sale (the "Purchase Agreement"), common sales agents and sales facilities, common advertising, common marketing brochures, and common inventory. Additionally, First Home Builders authorized D&W, D'Alessandro, and Cabrera to use its name in the Prospectus and to set up a satellite sales office in the same location as First Home Builders.

Plaintiffs allege that the Prospectus and various oral representations made by defendants contained the following false and misleading statements: (1) That tenants would be procured for each investment property through the sole efforts of First Home Builders; (2) that the investor would receive a fourteen percent (14%) rate of return on his/her investment based upon a tenant occupying, and then purchasing, the property; (3) that the investor would have no out-of-pocket costs other than the initial down payment; and (4) that the tenant procured by First Home Builders would ultimately purchase the property from the investor.

---

[3]Defendant Jan Baillargeon, in her capacity as Personal Representative of the Estate of Frank D'Alessandro.

[4]Defendant Samir Cabrera.

[5]Defendant Honora Kreitner.

Each of the plaintiffs alleges that he or she purchased one or more lots from defendants based upon their written and oral representations.  Plaintiffs Randolph and Daphne Sewell purchased three lots; plaintiff Henriette Eshkenazi purchased two lots; and plaintiffs Moses and Therese Eshkenazi purchased four lots.  The Purchase Agreements obligated plaintiffs, among other things, to acquire "interim 'construction financing' for the purpose of acquiring the property and constructing a home and improvements thereon, and then, upon completion of the home, to secure permanent mortgage financing, or an 'end-loan' to . . . pay off the interim construction financing loan."  (Doc. #205, ¶38.)  After the Purchase Agreements were signed, First Home Builders and/or D&W arranged for plaintiffs to receive interim construction financing from First Home Builders' and/or D&W's preferred lenders in the principal amounts of approximately 100% of the full purchase price (thus including sales profit to First Home Builders in addition to construction costs).  Each construction loan had a one-year term. The borrowed amounts greatly exceeded plaintiffs' ability to repay, and plaintiffs assert that they were induced to enter into such loans based upon the following false and misleading assurances by defendants: (1) That plaintiffs' total cash outlay would be limited to their initial contract deposits; (2) that First Home Builders would make all loan payments during the course of construction; and (3) that upon completion of construction and procurement of an end-loan, the rental payments received from tenants procured by First

Home Builders and/or D&W would exceed any amounts that would otherwise be due and owing under the permanent loan.

In late October 2006, the Sewells expressed concerns that First Home Builders and D&W had not yet procured tenants for the properties, as promised.  In response, First Home Builders and Hovnanian began pressuring the Sewells to secure permanent financing.  The Sewells were unable to obtain permanent mortgage financing and became defendants in state court foreclosure proceedings.  While the Eshkenazis were able to obtain permanent mortgage financing for their houses, they face difficulties in meeting their loan obligations without the benefit of rental income and risk losing their properties in foreclosure proceedings.

Plaintiffs' nine-count Second Amended Complaint alleges the following claims: (1) violation of Section 12(a)(2) of the Securities Act of 1933 (by defendants Hovnanian, First Home Builders, D&W, and GDW) (Count I); (2) "controlling person" liability under Section 15(a) of the Securities Act of 1933 (by defendants D'Alessandro, Cabrera, Robb,[6] and Logue[7]) (Count II); (3) fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 (by all defendants) (Count III); (4) "controlling person" liability under Section 20(a) of the Securities Exchange Act of 1934 (by defendants D'Alessandro,

---

[6]Defendant Bruce A. Robb.

[7]Defendant Patrick Logue.

Cabrera, Robb, and Logue) (Count IV); (5) violation of Sections 1703(a)(1)(A) and (B) of the Interstate Land Sales Full Disclosure Act (by all defendants) (Count V); (6) fraud in violation of Sections 1703(a)(2)(A)-(C) of the Interstate Land Sales Full Disclosure Act (by all defendants) (Count VI); (7) breach of contract (by defendants First Home Builders, Hovnanian, D&W, and GDW) (Count VII); (8) breach of duty of good faith and fair dealing (by defendants Hovnanian, First Home Builders, D&W, and GDW) (Count VIII); and, (9) deceptive and unfair trade practices (by all defendants) (Count IX). Plaintiffs also seek class certification of the following class:

> All persons who purchased one or more real properties for investment purposes from First Home Builders in either Cape Coral or Lehigh Acres, Florida between September 1, 2003 and December 31, 2006 (the 'Class Period') based upon representations made by First Home Builders or any of its agents, including, but not limited to the real estate brokerage firm of D'Alessandro & Woodyard, Inc., that: (a) investors would receive a fourteen percent return on their investment based upon a tenant occupying, and then ultimately purchasing, the property; (b) the tenants for each property would be procured solely through the efforts and expertise of First Home Builders and/or D'Alessandro and Woodyard (and/or their respective affiliates or co-brokers); and (c) no cash outlay would be required from investors other than the initial down payment.

(Doc. #205, ¶54.)

## II. Motion to Dismiss Standard

The applicable standards for motions to dismiss were set forth in the Court's previous Opinion and Order (Doc. #203) dated September 29, 2008, and are adopted herein without repetition.

Additional cases decided since that time set forth and apply the same standards. E.g., Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009); Rosenberg v. Gould, 554 F.3d 962 (11th Cir. 2009); Mizzaro v. Home Depot, Inc., 544 F.3d 1230 (11th Cir. 2008).

### III. Successor Liability

Defendants Hovnanian and GDW assert that they should be dismissed from the case because the Second Amended Complaint fails to sufficiently allege the existence of successor liability against them. Defendant GDW also seeks, in the alternative, summary judgment on this issue. Under Florida law, a predecessor corporation's liabilities are generally not imposed on its successor unless: (1) the successor expressly or impliedly assumes the obligations of the predecessor; (2) the transaction is a de facto merger; (3) the successor is a mere continuation of the predecessor; or (4) the transaction is a fraudulent effort to avoid the liabilities of the predecessor. Centimark Corp. v. A to Z Coatings & Sons, Inc., 288 Fed. Appx. 610, 614 (11th Cir. 2008) (citing Bernard v. Kee Mfg. Co., 409 So. 2d 1047, 1049 (Fla. 1982)); Lab. Corp. v. Prof'l Recovery Network, 813 So. 2d 266, 269 (Fla. 5th DCA 2002). Plaintiffs assert that defendant Hovnanian is

liable under the first and second bases of successor liability,[8] and that GDW is liable under the second basis.[9]

Plaintiffs assert that the Purchase Agreements entered into by plaintiffs were "[a]mong the assets purchased (and liabilities assumed) by Hovnanian" and that Hovnanian "replaced First Home Builders as the 'seller/builder' with respect to each subject agreement," "took over the performance of all remaining contractual obligations," and "either expressly or implicitly assumed the liabilities associated with those purchase agreement." (Doc. #205, ¶12.) The Court finds this sufficient to satisfy the first basis for successor liability.

As to their "de facto merger" theory, plaintiffs allege that Hovnanian "was formed by Hovnanian Enterprises, Inc. in July 2005 for the purpose of continuing the business of First Home Builders," "replaced First Home Builders as the 'seller/builder' with respect to each subject purchase agreement" and "has taken over the full performance thereof." Plaintiffs further allege that since August

---

[8]The Second Amended Complaint asserts that Hovnanian is the successor-in-interest to defendant First Home Builders because "on or about August 2005, Hovnanian . . . purchased the assets (and assumed the liabilities) of First Home Builders," (Doc. #205, ¶12), and that Hovnanian and First Home Builders entered into a "de facto merger" (id.).

[9]The Second Amended Complaint asserts that defendant GDW is liable as the successor-in-interest to D&W "by virtue of a July 28, 2006 transaction, the effect of which was to create a merger and/or a *de facto* merger between D&W and another prominent real estate firm, Gates McVey, to form a new entity called 'Gates, D'Alessandro & Woodyard, LLC. . . .'" (Doc. #205, ¶9.)

2005, First Home Builders "has ceased all homebuilding activities" and that Hovnanian "has completely taken over the business operations of First Home Builders." (Doc. #205, ¶12.) Plaintiffs assert that several of First Home Builders' officers are now officers of Hovnanian, that many of the employees have transferred from First Home Builders to Hovnanian, that Hovnanian is located at the same address as First Home Builders, and that Hovnanian is in the same business as First Home Builders. "In essence, the business of First Home Builders has been absorbed by Hovnanian. By virtue of the foregoing, there has been a clear relay-style passing of the baton from First Home Builders to Hovnanian . . . ." (Id.) As to GDW, Plaintiffs cite various press releases and public statements made by GDW, D&W, D&W's principal, and Gates McVey, which indicate that GDW and D&W share the same address, share at least two of the same officers, and share employees (id.). Plaintiffs claim that the "continuity of management, personnel and physical address, coupled with GDW's and D&W's own statements that a merger had occurred between the companies [] supports a finding of a de facto merger under Florida law." (Id.) The Court finds these allegations sufficient to satisfy the second basis for successor liability as to each defendant.

The Court finds, upon consideration of the Second Amended Complaint in its entirety, that plaintiffs have adequately pled the existence of successor liability as to Hovnanian and GDW. Therefore, the motion to dismiss on this basis will be denied. As

to GDW's motion for summary judgment on this issue, the Court finds that, in the absence of any discovery conducted in this case, the Court will deny summary judgment.  See FED. R. CIV. P. 56(f).

## IV. Securities Claims - Counts I through IV

Plaintiffs allege in Count I that defendants Hovnanian, First Home Builders, D&W, and GDW violated Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2).[10]    After incorporating the first 63 paragraphs of the Second Amended Complaint, plaintiffs assert that the Purchase Agreements and the properties represented thereby are "in the nature of an 'investment contract,' and, hence, are considered a 'security' subject to the federal securities laws . . . ."  (Doc. #205, ¶65.)  Plaintiffs further assert that defendants First Home Builders, Hovnanian, and D&W are "seller[s]" of a "security," (id. at ¶¶ 66, 67); that the

---

[10]Section 12(a)(2) of the Securities Act of 1933 imposes liability on:

Any person who–
. . . .
(2) offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such truth or omission, . . . .

15 U.S.C. § 77l(a)(2).

"First Home Lease Purchase Investment Opportunity" document is a "Prospectus" within the meaning of the federal statute; and that each defendant has "offered to sell or sold a security by means of a prospectus or oral communication which included untrue statements of material facts and omissions of material facts necessary to make the statement made . . . not misleading," in violation of Section 12(a)(2).  (Doc. #205, ¶69.)  Plaintiffs further allege that this constituted a "public offering" and that defendants should have been required to furnish investors with a registration statement. (Id. at ¶70.)

Count II alleges "controlling person" liability, pursuant to Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o,[11] against defendants D'Alessandro, Cabrera, Robb, and Logue, "by virtue of their top-level executive positions" within D&W (as to D'Alessandro and Cabrera) and within First Home Builders (as to Robb and Logue). (Doc. #205, ¶¶ 75-76, 78-79.)  Incorporating prior paragraphs,

_____

[11]Section 15 of the Securities Act of 1933 imposes joint and several liability on:

> [e]very person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, . . . unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o.

plaintiffs claim that these defendants "were culpable participants in the fraudulent scheme" and "caused their companies to engage in the acts and omissions which give rise to liability under Section 12(a)(2) of the Securities Act." (Id. at ¶77.)

Plaintiffs allege in Count III that defendants First Home Builders, Hovnanian, D&W, GDW, D'Alessandro, Cabrera, Kreitner, Logue, and Robb engaged in fraud in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b),[12] and Rule 10b-5, 17 C.F.R. § 240.[13]    Incorporating prior paragraphs,

_____

[12]Section 10(b) of the Securities Exchange Act of 1934 makes it:

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-
> . . . .
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

[13]Rule 10b-5 makes it:

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act,
>                                         (continued...)

plaintiffs assert that each of these defendants violated subsections (a) and (c) of Rule 10b-5 when they "directly or indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of securities . . . knowingly, willfully and/or recklessly (a) employed devices, schemes or artifices to defraud, and/or (c) engaged in acts, practices and courses of business which have operated as a fraud upon purchasers of such securities." (Doc. #205, ¶84.) Plaintiffs allege that these defendants "were the masterminds" and "devised a scheme through which vacant lots in Cape Coral and Lehigh Acres would be marketed and sold as 'tenant-occupied' and generating 'double-digit' returns based upon the tenant (procured through the sole efforts of D&W and First Home Builders) initially renting and then purchasing the property from the initial investor." (Id. at ¶85.)

Count III also alleges that these defendants violated subparagraph (b) of Rule 10b-5 by making the following specific misstatements of material fact in order to induce plaintiffs to purchase the various real estate investments: (a) That tenants would be provided for each property purchased; (b) that investors would receive a fourteen percent (14%) rate of return on each

---

[13](...continued)
practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

investment property based upon a tenant occupying, and then purchasing, the property; (c) that no cash outlay would be required other than the initial down payment; and (d) that First Home Builders and/or D&W would take care of everything, including, but not limited to, the procurement of tenants through their sole efforts.  (Doc. #205, ¶86.)

Count IV alleges "controlling person" liability under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a),[14] against D'Alessandro, Cabrera, Robb, and Logue, "by virtue of their top-level executive positions" within their respective companies. (Id. at ¶¶ 101, 102.)  Incorporating prior paragraphs, plaintiffs claim that these defendants caused their respective companies to "engage in the acts and omissions" that constituted violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.  (Id. at ¶¶ 101, 102.)

**A.  Purchase Agreements as "Securities":**

The defendants named in Counts I through IV assert that those counts must be dismissed because the purported investment opportunity described in the Second Amended Complaint did not

_____

[14]Section 20(a) imposes joint and several liability on:

[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

involve the offer or sale of "securities."  The defendants variously phrase the issue in terms of subject matter jurisdiction, failure to state a claim, or a lack of standing.[15]  Plaintiffs respond that the Purchase Agreements constitute "investment contracts" and are therefore "securities" within the meaning of the statutes, and that the Second Amended Complaint adequately sets forth facts to establish this contention.

**(1) General Legal Principles:**

To establish claims under Counts I through IV, the Second Amended Complaint must adequately allege that the transactions at issue involved a "security" within the meaning of the relevant federal statutes.  <u>Fin. Sec. Assur., Inc. v. Stephens, Inc.</u>, 500 F.3d 1276, 1285 (11th Cir. 2007), <u>reh'g en banc denied</u>, 261 Fed. Appx. 280 (11th Cir. 2008).  There is no doubt that a "security" includes "investment contracts," 15 U.S.C. § 77b(a)(1), and the Second Amended Complaint alleges that this case involves such investment contracts (Doc. #205, ¶65).  Defendants argue, however, that the facts alleged in the Second Amended Complaint do not establish that investment contracts were involved.

An investment contract is "a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is

_____

[15]To have standing to bring a claim under Rule 10b-5, plaintiff must be a purchaser or seller of securities, or someone with a contract to purchase or sell securities.  <u>Blue Chip Stamps v. Manor Drug Stores</u>, 421 U.S. 723 (1975); <u>Fin. Sec. Assur., Inc. v. Stephens, Inc.</u>, 500 F.3d 1276, 1283 (11th Cir. 2007).

led to expect profits solely from the efforts of the promoter or a third party." SEC v. Merchant Capital, LLC, 483 F.3d 747, 754 (11th Cir. 2007) (quoting SEC v. W. J. Howey Co., 328 U.S. 293, 298-99 (1946)), rev'd and remanded on other grounds, 311 Fed. Appx. 250 (11th Cir. 2009).  It is clear that the purchase of lots or houses for personal use does not constitute an investment contract and is therefore not a security.  Rice v. Branigar Organization, Inc., 922 F.2d 788, 790-91 (11th Cir. 1991).  The purchase of lots or houses for investment purposes, however, may constitute a security.  Gordon v. Terry, 684 F.2d 736 (11th Cir. 1982).  The Eleventh Circuit uses either a three or four-part test to determine whether an investment contract exists: "(1) an investment of money, (2) a common enterprise, (3) the expectation of profits, and (4) the expectation of profits to be derived solely from the efforts of others." SEC v. ETS Payphones, Inc., 408 F.3d 727, 731-32 (11th Cir. 2005).[16]  This is intended to be a broad definition and a flexible test.  SEC v. Edwards, 540 U.S. 389, 393 (2004); SEC v. Mut. Bens. Corp., 408 F.3d 737, 742 (11th Cir. 2005).

**(2) Application to Present Case:**

Defendants argue that the second and fourth elements of the test are missing from this case.  Viewing the well-pled factual allegations in the light most favorable to plaintiffs, the Court disagrees.

---

[16]The three-part test simply combines the third and fourth elements.

### (a) Common Enterprise:

A "broad vertical commonality test" is used to determine whether investors operated under a common enterprise. ETS Payphones, 408 F.3d at 732. This test "requires the movant to show that the investors are dependent upon the expertise or efforts of the investment promoter for their returns." Id. (internal citation and quotation omitted). A common enterprise exists "where the fortunes of the investor are interwoven with and dependent on the efforts and success of those seeking the investment or of third parties." SEC v. Unique Fin. Concepts, Inc., 196 F.3d 1195, 1199-1200 (11th Cir. 1999) (citations omitted). "[T]he thrust of the common enterprise test is that the investors have no desire to perform the chores necessary for a return." Unique Fin., 196 F.3d at 1200 (citation omitted).

The Court finds that the Second Amended Complaint satisfies the pleading requirements as to the common enterprise element. Paragraphs 18 through 53 allege repeatedly that plaintiffs purchased the properties as investment opportunities based upon the assurances that defendants would do all of the essential work necessary to ensure a fourteen percent (14%) rate of return; that nothing other than the purchase would be required of plaintiffs, including no out-of-pocket expenses other than a down payment; and that the failure of defendants to successfully perform those functions would and did adversely affect the success of the investment opportunity. This is sufficient at this stage of the

-18-

proceedings.  While defendants argue that the outcome was simply the result of external market forces and that no entrepreneurial or managerial skills were involved, this alternative view of the facts cannot be resolved on a motion to dismiss, even under the subject matter jurisdiction theory.

### (b) Solely From Efforts of Others:

Defendants do not dispute that there was an expectation of profit, but assert that the fourth element--that the expectation of profits be derived "solely" from the efforts of others—has not been satisfied.  Defendants argue that the investors retained sufficient power and control to defeat this required element.  Additionally, defendants argue that plaintiffs' investment return was not dependent on the success of the promoters' efforts, but was entirely dependent upon external market forces, i.e., on the existence of prospective home buyers interested in leasing homes with options to purchase.

In this context, "'solely' is not interpreted restrictively," but is governed by economic reality and focuses on the dependency of the investor on the entrepreneurial or managerial skills of the other party.  Merchant Capital, 483 F.3d at 754-55.  "The fourth element of the Howey test asks the amount of control that the investors retain[ed] under their written agreements.  The more control investors retain[ed], the less likely it becomes that the contract qualifies as a security."  ETS Payphones, 408 F.3d at 732 (internal citation and quotation omitted).  The first step is

therefore to look to the contracts. <u>Albanese v. Florida Nat'l Bank</u>, 823 F.2d 408, 410 (11th Cir. 1987). Control given to the investors that is illusory or insufficient, however, does not disqualify the transaction from being an investment contract. <u>Eberhardt v. Waters</u>, 901 F.2d 1578, 1581-82 (11th Cir. 1990); <u>Albanese</u>, 823 F.2d at 412.

The Court finds that the Second Amended Complaint satisfies the pleading requirements as to the fourth element at the motion to dismiss stage of these proceedings. While plaintiffs retain some measure of control under the provisions of their respective Purchase Agreements, paragraphs 18 through 53 of the Second Amended Complaint contain sufficient well-pled factual allegations to preclude the Court from finding that this element of the claim is not plausible. Accordingly, this aspect of the motions will be denied.

**B. Unregistered Security:**

Defendant Hovnanian (and others, by adoption) argue that Counts I and II must be dismissed even if the investment opportunity program is designated a "security" because Section 12(a)(2) only applies to registered public offerings (<u>see</u> Doc. #265, pp. 26-29). Defendants argue that the Second Amended Complaint does not allege that the "securities" were registered with the Securities and Exchange Commission (SEC).

Defendants rely upon <u>Gustafson v. Alloyd Co.</u>, 513 U.S. 561 (1995) as their sole binding authority. The issue in <u>Gustafson</u> was

whether the contract between the parties was a "prospectus" as that term is used in the statute. Id. at 568. The Court found that Congress intended § 12 to apply only to public offerings, and not private transactions. Id. at 584. Nothing requires, however, that the public offering be "registered" before a claim can be actionable. The Second Amended Complaint does allege that the investment scheme constituted a "public offering" (albeit apparently unregistered), and provided sufficient facts to make the allegation plausible (Doc. #205, ¶70). Accordingly, this aspect of the motions will be denied.

## C. Statute of Limitations:

All of the defendants named in Counts I through IV assert that the statutes of limitations bar these counts because the original Complaint (Doc. #1), filed on May 30, 2007, was filed outside of the applicable statutory periods. Defendants argue that various provisions of the Purchase Agreements entered into by the Sewell and Eshkenazi plaintiffs were so inconsistent with defendants' alleged representations that plaintiffs were on inquiry notice of the facts underlying their claims as of the date they entered into the Purchase Agreements. Additionally, some of the defendants argue that additional facts set forth in the Second Amended Complaint also show that the Sewells were on inquiry notice at a time that renders the Second Amended Complaint untimely.

**(1) General Legal Principles:**

The claims in Counts I and II, being brought under the Securities Act, must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of due diligence." 15 U.S.C. § 77m.  The claims in Counts III and IV, being brought under the Securities Exchange Act, "may be brought not later than the earlier of . . . 2 years after the discovery of the facts constituting the violation; or . . . 5 years after such violation." 28 U.S.C. § 1658(b).

A statute of limitations bar is an affirmative defense, and as such, generally needs not be negated by plaintiffs in their complaint.  E.g., La Grasta v. First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir. 2004).  A dismissal based upon statute of limitations grounds is appropriate under FED. R. CIV. P. 12(b)(6) "only if it is apparent from the face of the complaint that the claim is time-barred."  Id. at 845 (citation and internal quotation omitted).  In the securities context, the statute of limitations begins to run when a potential plaintiff has inquiry or actual notice of a violation.  Id. at 846.  "Whether a plaintiff had sufficient facts to place him on inquiry notice of a claim for securities fraud . . . is a question of fact, and as such is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6)."  Id. at 848 (citation and internal quotation omitted).  On the other hand, the Eleventh Circuit has, in several cases,

found it to be apparent on the face of the complaint that an action was barred by the statute of limitations.  E.g., Theoharous v. Fong, 256 F.3d 1219 (11th Cir. 2001); Franze v. Equitable Assur., 296 F.3d 1250 (11th Cir. 2002); Grippo v. Perazzo, 357 F.3d 1218 (11th Cir. 2004).  Defendants bear the burden of proving the statute of limitations defense.  Tello v. Dean Witter Reynolds, Inc., 494 F.3d 956, 974 (11th Cir. 2007) ("Tello II").

Since at least Theoharous, inquiry notice has been defined in the Eleventh Circuit as "knowledge of facts that would lead a reasonable person to begin investigating the possibility that his legal rights had been infringed."  256 F.3d at 1228.  "Plaintiff need not . . . have fully discovered the nature and extent of the fraud before he was on notice that something may have been amiss. Inquiry notice is triggered by evidence of the *possibility* of fraud, not full exposition of the scam itself."  Id. at 1228 (citation omitted) (emphasis in original).  See also Franze, 296 F.3d at 1254; Grippo, 357 F.3d at 1224; Tello v. Dean Witter Reynolds, Inc., 410 F.3d 1275, 1283 (11th Cir. 2005) ("Tello I"); Tello II, 494 F.3d at 968-78.  The Court applies an objective reasonable person standard.  Franze, 296 F.3d at 1254; Grippo, 357 F.3d at 1224.  Determination of the existence of inquiry notice is done on a case-by-case basis.  Tello II, 494 F.3d at 971.

The Court must limit its consideration to well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed.  La Grasta, 358 F.3d at 845.  The

Court may consider documents that are central to a plaintiff's claim whose authenticity is not challenged, whether the document is physically attached to the complaint or not, without converting the motion into one for summary judgment. <u>Day v. Taylor</u>, 400 F.3d 1272, 1276 (11th Cir. 2005); <u>Maxcess, Inc. v. Lucent Techs., Inc.</u>, 433 F.3d 1337, 1340 n.3 (11th Cir. 2005). Accordingly, the Court will take judicial notice of the various signed and unsigned copies of the Purchase Agreement that are attached as exhibits to documents filed by the parties.

**(2) Application to Present Case:**

The primary issue is whether, after accepting all well-pled facts in the Second Amended Complaint as true, the contractual provisions establish that plaintiffs were on inquiry notice at a time that renders the claim time-barred. <u>E.g.</u>, <u>Tello I</u>, 410 F.3d at 1288 n.12, 13. The original Complaint (Doc. #1) was filed by the Sewells on May 30, 2007; the First Amended Complaint (Doc. #82), which added the Eshkenazis as plaintiffs, was filed on October 19, 2007. Because there is a one-year statute of limitations as to Counts I and II, these claims will be barred if plaintiffs were on inquiry notice of the alleged violations before May 30, 2006. <u>See Theoharous</u>, 256 F.3d at 1228. Likewise, because there is a two-year statute of limitations as to Counts III and IV, these claims will be barred if plaintiffs were on inquiry notice before May 30, 2005. <u>See id.</u>

-24-

Some of the provisions in the Purchase Agreements upon which defendants rely to indicate constructive or inquiry notice are simply generic integration and merger provisions. Such clauses are common contractual provisions and do not, standing alone, inherently constitute inquiry notice. These generic provisions, however, did not stand alone in this case. Clause XVI of each of the Sewell Purchase Agreements provided:

> NO LEGAL, TAX, OR INVESTMENT ADVICE: Builder/Seller, its subsidiaries or affiliates, its ownership, management, or employees cannot be relied upon to offer advice concerning the legal, tax or investment implications of purchasing this home. Buyer hereby waives any claim against Builder/Seller, its subsidiaries or affiliates, its ownership, management, or employees that may otherwise be made concerning the legal, tax or investment performance of the purchase of this home. Buyer further acknowledges that Builder/Seller had made no guarantees that relate to appreciation of the value of this home or any other real estate, to the rental rates or vacancy factors associated with any real estate, nor to the ability to secure renters or subsequent buyers for this home or any other real estate. Buyer states that Buyer has conducted adequate research and investigation and that the decision to purchase this home was not influenced in any part by statements made by Builder/Seller with regard to legal, tax, or investment considerations . . . .

(Doc. #1-4, pp. 4-5; Doc. #1-5, p. 4; Doc. #1-6, pp. 4-5.) Three of the Eshkenazi Purchase Agreements contain this same paragraph XVI (Docs. ## 128-5, 128-6, 128-7); another three of the Eshkenazi Purchase Agreements contain the same paragraph, but designated as Paragraph XIV in those contracts (Docs. ## 128-8, 128-9, 128-10). Plaintiffs are charged with having read this provision, whether they actually did so or not. _Franze_, 296 F.3d at 1254-55.

In <u>Franze</u>, the Eleventh Circuit held that plaintiffs were on inquiry notice when they received a prospectus and variable life insurance policy because they "could have discovered the alleged misrepresentations simply by reading these documents." <u>Id.</u> at 1254. The same is true of the Purchase Agreements in this case.

The Second Amended Complaint alleges repeatedly that plaintiffs purchased the lots and houses in reliance upon defendants' representations that plaintiffs would earn a fourteen percent (14%) rate of return; that defendants, through their sole efforts, would obtain tenants ready to immediately rent the houses and then purchase the houses after a year; that defendants would take care of everything, including procurement of tenants; that the fourteen percent (14%) profit margin would be contractually agreed-upon by the tenants; and, that the fourteen percent (14%) profit margin was to be realized once the tenant refinanced the home and bought plaintiffs out of the deal. Thus, it was clear that obtaining suitable tenants was essential to achieving the promised return of fourteen percent (14%).

With this understanding of the investment opportunity, plaintiffs entered Purchase Agreements for a total of nine properties, each of which contained at least four statements that plaintiffs knew or should have known directly contradicted their understanding of the investment opportunity. Paragraphs XIV and XVI, respectively, informed plaintiffs that: (1) they could not rely upon the advice provided by defendants or their employees,

etc., concerning the "investment implications of purchasing this home"; (2) they waived any claim against defendants or their employees, etc., concerning the "investment performance of the purchase of this home"; (3) they acknowledged that defendants "had made no guarantees that relate . . . to the rental rates or vacancy factors associated with any real estate, nor to the ability to secure renters or subsequent buyers for this home or any other real estate"; and, (4) they were "not influenced in any part by statements made by defendants with regard to investment considerations . . . ."

Reasonable investors, faced with these fundamental discrepancies between what they had been told orally and in writing and the terms of their Purchase Agreements, would have been on inquiry notice that something was amiss with the "investment opportunity" promoted by these defendants. The Purchase Agreements negated the entire *raison d'être* of the proposed investment. These contradictions are even stronger than in Gerin v. Aegon USA, Inc., 242 Fed. Appx. 631 (11th Cir. 2007), where plaintiffs asserted that they were misled by prospectuses that failed to reveal that tax-deferred, variable annuities were not generally appropriate investments for placement into qualified retirement plans, which are already subject to tax-deferred growth. The Court found, in that case, that appellants were placed on inquiry notice by the prospectuses, which warned in three separate sections that they should consider whether it was appropriate to buy the tax-deferred,

variable annuities for placement into already tax-deferred accounts, and advised them to consult with independent professionals about the tax and legal consequences of such action. Therefore, the Court finds that the Purchase Agreements in this case placed plaintiffs on inquiry notice for purposes of triggering the statutes of limitations.

### (a) Sewell Plaintiffs:

The Second Amended Complaint asserts that the Sewell plaintiffs purchased the properties on July 15, 2005. (Doc. #205, ¶36.) The First Amended Complaint had asserted that the Sewell plaintiffs purchased the properties on May 10, 2005. (Doc. #82, ¶38.) The original Complaint contained unsigned copies of the Purchase Agreements (Docs. ## 1-4, 1-5, 1-6) which confirmed that the Purchase Agreement was "made and entered" on May 10, 2005. These unsigned copies note at the bottom of their pages, however, that they were printed on June 6, 9, and 13, 2005. Signed copies of the Purchase Agreements submitted by defendant D'Alessandro & Woodyard, Inc. (Docs. ## 115-2, 115-3, 115-4) show that the Purchase Agreements were signed by the Sewells on July 15, 2005. Thus, while the Sewells are deemed to have read documents that they signed, July 15, 2005 is the earliest date in the record on which the Court can determine that the Sewells signed the Purchase

Agreements.[17]  Accordingly, the Court concludes that the Sewells were on inquiry notice as of July 15, 2005.

Since the original Complaint was filed on May 30, 2007, it was filed beyond the expiration of the one-year statute of limitations (July 15, 2006) for Counts I and II as to the Sewells, but within the two-year statute of limitations (July 15, 2007) for Counts III and IV as to the Sewells.  Accordingly, the motions to dismiss as to the Sewell plaintiffs based upon the statutes of limitations will be granted as to Counts I and II as to all defendants, and denied as to Counts III and IV as to all defendants.

Defendant Robb asserts that plaintiffs' securities claims against him are time-barred because he was not named as a defendant in plaintiffs' original Complaint, but was added to plaintiffs' First Amended Complaint (Doc. #82) filed on October 19, 2007.  The First Amended Complaint was thus filed after the statute of limitations had run on the securities claims in Counts III and IV (Doc. #258, pp. 4, 10).  Defendant Logue was likewise unnamed in the original Complaint and was subsequently added by the First Amended Complaint.  Plaintiffs do not specifically address this issue.

---

[17]The Court agrees with <u>Garcia v. Santa Maria Resort, Inc</u>, 528 F. Supp. 3d 1283, 1291-92 (S.D. Fla. 2007), that the statute of limitations begins when the Purchase Agreement is signed.

Federal Rule of Civil Procedure 15(c)(1) provides, in relevant part, that an amendment to a pleading to add a party "relates back" to the date of the original pleading under certain circumstances:

> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out-or attempted to be set out-in the original pleading; or
>
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
>> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
>>
>> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

FED. R. CIV. P. 15(c)(1)(B), (C). "The purpose of Rule 15(c) is to permit amended complaints to relate back to original filings for statute of limitations purposes when the amended complaint is correcting a mistake about the identity of the defendant." Krupski v. Costa Cruise Lines, N.V., LLC, No. 08-16569, 2009 WL 1743654, at *2 (11th Cir. June 22, 2009) (quoting Powers v. Graff, 148 F.3d 1223, 1226 (11th Cir. 1998)). "Even the most liberal interpretation of 'mistake' cannot include a deliberate decision not to sue a party whose identity [the] plaintiff knew from the outset." Krupski, 2009 WL 1743654, at *2 (quoting Powers, 148 F.3d at 1227). While it seems unlikely the First Amended Complaint will relate back under the Powers principles, the motion to dismiss

record is not sufficiently developed for the Court to make the necessary factual findings. Therefore, the motions to dismiss Counts III and IV on statute of limitations grounds as to defendants Robb and Logue will also be denied.

### (b) Eshkenazi Plaintiffs:

The Eshkenazi plaintiffs were added with the filing of the First Amended Complaint (Doc. #82) on October 19, 2007. The First Amended Complaint asserts that the Eshkenazi plaintiffs purchased the properties on December 15, 2004. (Doc. #82, ¶38.) The Second Amended Complaint asserts that the Eshkenazi plaintiffs purchased the properties on various dates: one Purchase Agreement for Henriette Eshkenazi was signed by her on March 25, 2005 and another on November 7, 2006; three of the Purchase Agreements for Moses and Therese Eshkenazi were signed on March 23, 2005; and one of the Purchase Agreements for Moses and Therese Eshkenazi was signed on September 29, 2006. (Doc. #205, ¶37.) The Court concludes that Henriette Eshkenazi was on inquiry notice as of the date she signed her first Purchase Agreement, on March 25, 2005, and that Moses and Therese Eshkenazi were on inquiry notice as of the date they signed their first Purchase Agreement, on March 23, 2005.

Since the original Complaint was filed on May 30, 2007, even assuming the First Amended Complaint relates back as to the Eshkenazis, it was filed beyond the expiration of both the one-year statute of limitations for Counts I and II and the two-year statute of limitations for Counts III and IV. The Court notes that the

statutes of limitations as to the Purchase Agreements that were signed in September or November 2006 would not have expired based on the signing dates of those contracts. Since all three Eshkenazi plaintiffs had signed virtually the same Purchase Agreements in March 2005, however, they were on inquiry notice of the scheme as of that date even though they continued to sign new contracts in 2006. Therefore, each of the securities claims by all of the Eshkenazi plaintiffs are barred by the applicable statutes of limitations, and the motions to dismiss Counts I, II, III, and IV as to the Eshkenazi plaintiffs will be granted as to all defendants.

**(3) Statutes of Limitations Summary:**

Based upon the statutes of limitations, the claim in Count I by all plaintiffs is dismissed as to all defendants; the claim in Count II by all plaintiffs is dismissed as to all defendants; the claim in Count III by Moses Eshkenazi, Therese Eshkenazi, and Henriette Eshkenazi is dismissed as to all defendants; the claim in Count IV by Moses Eshkenazi, Therese Eshkenazi, and Henriette Eshkenazi is dismissed as to all defendants; and the claims in Counts III and IV by Randolph Sewell and Daphne Sewell are not dismissed as to any defendant. Thus, Counts I and II are dismissed in their entirety, while Counts III and IV remain viable (at least as to the statute of limitations issue) as to the Sewells only.

**D. Securities Pleading Requirements:**

In light of these rulings, the Court need only address the pleading requirements as to the claims in Counts III and IV by the Sewell plaintiffs against the named defendants.

Count III alleges liability against First Home Builders, D&W, GDW, Hovnanian, D'Alessandro, Cabrera, Kreitner, Logue, and Robb on two distinct bases: misrepresentations under Rule 10b-5(b) and "scheme liability" under Rules 10b-5(a) and (c). The portion of Count III that relies upon Rule 10b-5(b) must allege six elements: (1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called "loss causation." Mizzaro, 544 F.3d at 1237. The portion of Count III relying upon Rule 10b-5(a), which proscribes a "device, scheme, or artifice to defraud," must allege not only that defendants concocted a plan to defraud, but that the plan was successful--that is, that the defendants, acting with scienter, misrepresented a material fact on which the plaintiffs relied to their detriment. Ledford v. Peeples, 568 F.3d 1258, 1313 (11th Cir. 2009). Similarly, the portion of Count III relying upon Rule 10b-5(c) must allege an "act, practice or course of business which operates or would operate as a fraud or deceit upon any person." Rule 10b-5(c).

As to Count IV, which alleges "controlling person" liability under Section 20(A) of the Exchange Act against defendants D'Alessandro, Cabrera, Robb, and Logue, the Second Amended Complaint must allege three elements: (1) that D&W committed a primary violation of the securities laws; (2) that the individual defendants had the power to control the general business affairs of D&W; and (3) that the individual defendants had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability. Mizzaro, 544 F.3d at 1237; Rosenberg v. Gould, 554 F.3d 962, 966-67 (11th Cir. 2009). If the Second Amended Complaint fails to allege primary liability under § 10(b), there can be no control liability under § 20(a). Rosenberg, 554 F.3d at 967.

**(1) Particularity of Fraud Allegations:**

The Court has previously summarized the standards under Rule 9(b) and the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4(b) (1998), as to the requirement for particularity of the fraud allegations. (See Doc. #203.) In sum, a fraud-based complaint is required to set forth: (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendants obtained as a consequence of the fraud. Ziemba v. Cascade Int'l, Inc., 256

-34-

F.3d 1194, 1202 (11th Cir. 2001); <u>Garfield v. NDC Health Corp.</u>, 466 F.3d 1255, 1262 (11th Cir. 2006).

The Second Amended Complaint (Doc. #205) sets forth what it purports to be "The Actionable Misrepresentations and Omissions Attributable to the Defendants," at paragraphs 26 through 35. The false representations[18] are all contained in the "First Home Lease Purchase Investment Opportunity" document provided to the Sewells and oral representations made to the Sewells that followed the "template" of that document. This portion of The Second Amended Complaint alleges ten disclosures and representations (Doc. #205, ¶29) and one further representation (<u>id.</u> at ¶30), literally all of which plaintiffs contend were materially false and misleading. (<u>Id.</u> at ¶34 ("[t]he foregoing representations and disclosures made by the above-named Defendants were materially false and misleading.").)

In contrast, a fair reading of the Second Amended Complaint demonstrates that there are really only four misrepresentations properly alleged by plaintiffs. As set forth explicitly in Count III, the misrepresentations are: (1) that tenants would be provided for each property purchased; (2) that investors would receive a fourteen percent (14%) rate of return on each investment property based upon a tenant occupying, and then purchasing, the property;

---

[18]No omissions are identified in the Second Amended Complaint, and plaintiffs do not argue that omissions are part of their claims (Doc. #273, pp. 20-24).

(3) that no cash outlay would be required other than the initial down payment; and (4) that First Home Builders and/or D&W would take care of everything, including, but not limited to, the procurement of tenants through their sole efforts. (Doc. #205, ¶86.) The Court concludes that these allegations in Count III, coupled with paragraphs 27 through 28 and 31, satisfy the pleading requirements set forth above as to defendants Kreitner, D&W, First Home Builders, D'Alessandro, Cabrera, Robb, and Logue.[19]

**(2) Scienter:**

All of the defendants allege that Counts III and IV by the Sewells fail to adequately allege scienter. For the reasons stated below, the Court agrees.

Mizzaro contained a significant discussion of the scienter pleading requirements, concluding:

> Putting the PSLRA and our substantive scienter case law together yields the following stringent standard: to survive a motion to dismiss in this case, Bucks County must (in addition to pleading all of the other elements of a § 10(b) claim) plead "with particularity facts giving rise to a strong inference" that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements.

544 F.3d at 1238. The Court continued:

> Any discussion of what constitutes a "strong inference" of scienter must begin with the Supreme Court's recent decision in Tellabs. In that case, the Court held that a "strong inference" of scienter means an inference that is "cogent and at least as compelling as any opposing

_____

[19]The Court assumes, for purposes of the false statements portion of the motion, that group pleading is permissible.

inference one could draw from the facts alleged." <u>Tellabs</u>, 127 S. Ct. at 2510. Because the strong-inference inquiry asks "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard," "courts must consider the complaint in its entirety," and "omissions and ambiguities count against inferring scienter." <u>Id.</u> at 2509, 2511. Moreover, the inquiry is "inherently comparative" because courts "must take into account plausible opposing inferences." <u>Id.</u> at 2510, 2509. <u>Tellabs</u> explained how to balance opposing inferences this way:

> To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences." . . . Yet the inference of scienter must be more than merely "reasonable" or "permissible"--it must be cogent and compelling, thus strong in light of other explanations.

<u>Id.</u> at 2510. "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" <u>Id.</u> at 2511.

Notably, this test is not the same as the standard we employ for summary judgment under FED. R. CIV. P. 56, because it asks what a reasonable person would think, not what a reasonable person could think.

<u>Mizzaro</u>, 544 F.3d at 1238-39 (citing <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308 (2007)).

The Second Amended Complaint cites to eight factors to support plaintiffs' claimed showing of a strong inference of scienter.

(Doc. #205, ¶88.)  Defendants respond that the factual allegations fail to establish the required strong inference of scienter.

### (a) Severe Recklessness:

Plaintiffs allege that defendants acted with scienter, as evidenced by the "severe recklessness in guaranteeing rentals and profitability to unsophisticated investors with respect to a speculative real estate investment."  (Doc. #205, ¶88(a).)  The Eleventh Circuit has stated that "severe recklessness" "is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  <u>Mizzaro</u>, 544 F.3d at 1238.  The Court concludes that severe recklessness has not been properly pled because it is a stretch to say that defendants' "guaranteed" rentals and profitability, even taking into account the "First Home Lease Purchase Investment Opportunity" offering document (Doc. #205, ¶23).

### (b) Artificially-inflated Purchase Price and Loan Amount:

Plaintiffs also allege that defendants acted with scienter as evidenced by "the artificially-inflated purchase price associated with each lot, which resulted from the guaranteed income stream and profit being factored into the purchase price" and the inflated

loan amount associated with each construction loan (Doc. #205, ¶¶ 88(f), 88(b)).  These are references to: the allegations that the amount of the construction loan was approximately 100% of the full purchase price, which necessarily included not only First Home Builders' construction costs but also its sales profits, therefore artificially inflating the appraised value of each property (id. at ¶40); and to the claim that the prospect of "ready-made" tenants and a guaranteed rate of return made the properties more profitable to sell than unoccupied properties (id. at ¶23).  The Court finds nothing unusual about such circumstances, as profit is a legitimate component of the costs of construction and typically may be reflected in the loan amount.  As noted above, it is a stretch to construe the facts pled as guaranteeing rentals or profitability. Thus, this is insufficient to plead scienter.

### (c) Exclusive Listing Agreement:

Plaintiffs also allege that defendants acted with scienter as evidenced by the "Exclusive Listing Agreement (which purported to give Defendants up to 40 months to find a tenant, when they had previously represented to Plaintiffs that a tenant would be provided not later than the date that Plaintiffs took delivery of their properties)."  (Doc. #205, ¶88(c).)  The September 2005 Exclusive Listing Agreement, which was never executed by any plaintiff, is equally compatible with defendants' view that they never guaranteed tenant rentals or profits, and that a fair reading

-39-

by plaintiffs of their materials would have clearly established
this fact.  Thus, this is insufficient to plead scienter.

### (d) Failure to Comply with ILSFDA Disclosure Requirements and Failure to Register Securities:

Plaintiffs also allege that defendants acted with scienter, as
evidenced by their purported failure to comply with two
requirements of the Interstate Land Sales Full Disclosure Act,
i.e., the failure to file a "Statement of Record" with the U.S.
Department of Housing and Urban Development and failure to furnish
plaintiffs with a "Property Report" prior to entering into
agreements with plaintiffs.  (Doc. #205, ¶88(d).)  Additionally,
plaintiffs allege that scienter is evident based upon defendants'
failure to register the securities with the Securities and Exchange
Commission (id. at ¶88(g)).  The Court finds that, absent more
detailed allegations supported by specific facts as to each
defendant, plaintiffs' allegations that defendants failed to file
a statement of record and property report, or that they failed to
register the purported securities with the Securities and Exchange
Commission, are simply insufficient to plead scienter.

### (e) Defendants' Motives and Personal Financial Gain:

Finally, plaintiffs allege that defendants acted with
scienter, as evidenced by their "motive and personal financial
gain."  (Doc. #205, ¶88(h).)  Plaintiffs allege that First Home
Builders and Hovnanian have "profited greatly" and have enjoyed
"unprecedented profits" from their "fraudulent scheme."  Plaintiffs

also allege that defendants D&W, GDW, D'Alessandro, Cabrera, and Kreitner have profited from the sales by receiving commissions and/or fees from said sales. (See id. at ¶¶ 89-94.) Absent more, the obtainment of profits alone--even substantial or unprecedented profits--is simply insufficient to plead the existence of scienter.

Further, plaintiffs allege in support of their allegation of scienter, that defendants "stand to profit again" when the loans are satisfied. The Court notes, however, that the Purchase Agreements contain a "put" provision, which states:

> In the event that Buyer obtains and initially closes using a construction loan and is thereafter unable to obtain or qualify for the financing that would result in the end-closing, Buyer agrees to convey, via statutory deed to Builder/Seller the home and real property, at which time, Builder/Seller shall pay and satisfy the construction loan.

(Doc. #265-9, p. 7.) The Court finds that the inclusion of these provisions in the Purchase Agreements, which provided a mechanism for plaintiffs to relinquish the properties and shift the cost of the loans back to First Home Builders in the event that plaintiffs were unable to obtain financing, further calls into question plaintiffs' claim that defendants' singular desire for profit constitutes sufficient proof to establish a strong inference of scienter.

### (f) Aggregated Facts/Group Pleading:

The "factual allegations may be aggregated to infer scienter and must be inferred for each defendant with respect to each violation." Phillips, 374 F.3d at 1016. Even when the Court

-41-

considers cumulatively the facts set forth, the Court finds that there is not a strong inference of scienter as to each individual defendant.

### (3) Conclusion:

The Court finds that the Sewell plaintiffs have failed to properly plead that defendants acted with scienter, as required to establish the Rule 10b-5 violations set forth in Count III. See, e.g, Mizzaro, 544 F.3d at 1237; Ledford, 568 F.3d at 1313. Thus, it is unnecessary for the Court to analyze the remaining elements required as to Count III.

As to Count IV, which alleges Section 20(a) "controlling person" liability against defendants D'Alessandro, Cabrera, Robb, and Logue, the Court found that the Second Amended Complaint failed to properly allege primary liability under § 10(b) or Rule 10b-5 as to defendants D&W, GDW, First Home Builders, or Hovnanian; therefore, there can be no control person liability under § 20(a) as to defendants D'Alessandro, Cabrera, Robb and Logue. See, e.g., Rosenberg, 554 F.3d at 967. Thus, the motions to dismiss will be granted as to the Sewell plaintiffs' claims in Counts III and IV against all defendants.

### V. ILSFDA Claims - Counts V and VI

### A. Count V – ILSFDA Disclosure Requirements:

Plaintiffs allege in Count V that all of the defendants violated subsections 1703(a)(1)(A) and (B) of the Interstate Land

-42-

Sales Full Disclosure Act (the "ILSFDA"), 15 U.S.C. §§ 1703(a)(1)(A), (B).[20] After incorporating the first 63 paragraphs of the Second Amended Complaint, plaintiffs assert that all of the defendants failed to comply with the mandatory disclosure regime set forth by the ILSFDA, thereby rendering the Purchase Agreements "voidable at the absolute and conditional election" of plaintiffs and causing damages to plaintiffs. (Doc. #205, ¶¶ 113, 114, 118.) Specifically, plaintiffs allege that defendants failed to file a "statement of record" with the U.S. Department of Housing and Urban Development ("HUD"); failed to provide plaintiffs with a printed "Property Report" prior to inducing them to enter into the Purchase Agreements; failed to include contractual language in the Purchase Agreements stating that if the printed property report was not provided to the purchaser, the purchaser could revoke the Purchase Agreement within seven (7) days of signing; and failed to include contractual language in the Purchase Agreements stating that if the

---

[20]Subsections 1703(a)(1)(A) and (B) make it unlawful for any developer or agent, directly or indirectly, to use interstate commerce or the mails--

> (1) with respect to the sale or lease of any lot not exempt under section 1702 of this title--(A) to sell or lease any lot unless a statement of record with respect to such lot is in effect in accordance with section 1706 of this title; (B) to sell or lease any lot unless a printed property report, meeting the requirements of section 1707 of this title, has been furnished to the purchaser or lessee in advance of the signing of any contract or agreement by such purchaser or lessee. . . .

15 U.S.C. §§ 1703(a)(1)(A), (B).

property report was not provided to the purchaser, the purchaser could revoke the Purchase Agreement within two (2) years of signing. (Doc. #205, ¶113.)

Defendants assert that Count V should be dismissed for failure to state a claim because the ILSFDA disclosure requirements are inapplicable in this case. Defendants assert the property was not sold as part of a "common promotional plan," the properties did not constitute "subdivisions," the "investor exemption" applied to the transactions, and plaintiffs failed to sufficiently plead agency, individual, or successor liability. For the reasons set forth below, the motions to dismiss Count V by all defendants will be denied.

**(1) General Principles:**

The ILSFDA is an anti-fraud statute that uses disclosure as its primary tool to protect purchasers from unscrupulous sales of undeveloped home sites. Winter v. Hollingsworth Properties, 777 F.2d 1444, 1446-47 (11th Cir. 1985). The interpretation of a federal statute, particularly a statute with nationwide application, is governed by federal law. See, e.g., Dzikowski v. N. Trust Bank of Fla., N.A. (In re Prudential of Fla. Leasing, Inc.), 478 F.3d 1291, 1298 (11th Cir. 2007); Reed v. Heil Co., 206 F.3d 1055, 1059 (11th Cir. 2000). While the Court looks to Florida law as to the effect of an agreement, state law does not control the interpretation of the ILSFDA. Markowitz v. Ne. Land Co., 906 F.2d 100, 105 (3d Cir. 1990). In 1979, the Secretary published an

interpretive rule regarding the ILSFDA titled, "Guidelines for Exemptions Available Under the Interstate Land Sales Full Disclosure Act," 44 FED. REG. 24010 (1979).  That rule was superceded in 1984, 49 FED. REG. 31375 (1984), and eventually rescinded on March 27, 1996, as part of a streamlining process. See 61 FED. REG. 13596 (1996).  The information was moved to the HUD website, where it is now available as "Supplemental Information to Part 1710: Guidelines for Exemptions Available Under the Interstate Land Sales Full Disclosure Act."[21]  The Guidelines state that it is intended to clarify HUD polices and positions with regard to the statutory exemptions and that it is an interpretive rule and not a substantive regulation.  61 FED. REG. 13596, 13601 (1996).  As an interpretive agency rule, the Guidelines are entitled to some deference.  Reno v. Koray, 515 U.S. 50, 59 (1995).

**(2) Subdivisions/Common Promotional Plan:**

Defendants D&W, D'Alessandro, Cabrera, and Kreitner assert that Count V should be dismissed because the ILSFDA only applies to "subdivisions" and lots that are part of a "common promotional plan," neither of which apply to the investments in question.  (See Doc. #261, ¶¶ 76-81; Doc. #260, ¶¶ 66-72; Doc. #257, ¶¶ 98-104.)  Citing Title 15, United States Code, Section 1701(3), defendants emphasize that the lots were not contiguous, but rather were located in different cities in and around Lee County; the lots did

---

[21]http://www.hud.gov/offices/hsg/ramh/ils/ilsexemp.cfm

not constitute "subdivisions" as defined in the ILSFDA; and the homes were not known, designated or advertised as a common unit or by a common name.  Defendants assert that these deficiencies preclude plaintiffs from stating a cause of action under the ILSFDA.

The ILSFDA makes it unlawful for "any developer or agent" to sell non-exempt lots without complying with certain disclosure requirements.  15 U.S.C. § 1703(a).  To be a covered "developer or agent," the conduct of each must involve "lots in a subdivision." 15 U.S.C. § 1701(5), (6).  Section 1701(3) defines "subdivision" as:

> any land which is located in any State or in a foreign country and is divided or is proposed to be divided into lots, whether contiguous or not, for the purpose of sale or lease as part of a common promotional plan;

15 U.S.C. § 1701(3).  A "common promotional plan" is then defined as:

> a plan, undertaken by a single developer or a group of developers acting in concert, to offer lots for sale or lease; where such land is offered for sale by such a developer or group of developers acting in concert, and such land is contiguous or is known, designated, or advertised as a common unit or by a common name, such land shall be presumed, without regard to the number of lots covered by each individual offering, as being offered for sale or lease as part of a common promotional plan;

15 U.S.C. § 1701(4).  According to the HUD Guidelines, various factors may be taken into account to determine whether a "common promotional plan" exists.  Some of these factors enable a

presumption that a common promotional plan exists, while others

factors are indicative of its existence:

> A common promotional plan is presumed to exist if land is
> offered by a developer or a group of developers acting in
> concert and the land is contiguous or is known,
> designated, or advertised as a common development by a
> common name . . . . Other characteristics that are
> evaluated in determining whether or not a common
> promotional plan exists include, but are not limited to:
> a 10% or greater common ownership; same or similar name
> or identity; common sales agents; common sales
> facilities; common advertising; and common inventory.
> The presence of one or more of the characteristics does
> not necessarily denote a common promotional plan.
> Conversely, the absence of a characteristic does not
> demonstrate that there is no common promotional plan.

HUD Guidelines, Part II(b). The HUD Guidelines further state that:

> Two essential elements of a common promotional plan are
> a thread of common ownership or developers acting in
> concert. However, common ownership alone would not
> constitute a promotional plan. HUD considers the
> involvement of all principals holding a 10 percent or
> greater interest in the subdivision to determine whether
> there is a thread of common ownership. If there is a
> common ownership or if the developers are acting in
> concert, and there is common advertising, sales agents
> or sales office, a common promotional plan is presumed
> to exist. . . .

Id.  The absence of contiguity and a common name are not

necessarily fatal to establishing the existence of a common

promotional plan.  See, e.g., Eaton v. Dorchester Dev., Inc., 692

F.2d 727, 731 (11th Cir. 1982) ("In Dacus, the court found a

'common promotional plan' even though the lots were sold from

developments with different names. Similarly, [the HUD Guidelines]

set forth several factors considered by HUD in determining whether

or not a 'common promotional plan' exists.") (citing United States

v. Dacus, 634 F.2d 441, 444 (9th Cir. 1980)).  The Second Amended
Complaint alleges that defendants offered the lots as part of a
common promotional plan titled, "First Home Investment Opportunity
Program," and that the promotion, offer and sale involved common
sales agents, common sales facilities, common advertising and
common inventory.  (Doc. #205, ¶24.)  This, coupled with the facts
alleged in the preceding several paragraphs (Doc. #205, ¶¶ 20-23),
is sufficient to allege a common promotional plan.

The pleading of a "subdivision" is more problematic.  The
Second Amended Complaint does not plead that one or more
"subdivisions" were involved, but merely refers to "thousands of
real estate investment properties" (Doc. #205, ¶24) in Cape Coral
and Lehigh, Florida (Doc. #205, ¶20).  The Second Amended
Complaint's pleading of "developer" and "agents" (Doc. #205, ¶¶
110-12) makes no specific reference to the lots being in one or
more subdivisions.  However, the ILSFDA appears to contemplate a
broad definition of subdivision, and includes scattered site
subdivisions unless certain conditions are satisfied.  15 U.S.C. §
1702(b)(3); 24 C.F.R. § 1710.8.  At this stage of the proceedings,
the Court cannot find that it is implausible that the lots are
"subdivision" within the meaning of the ILSFDA.  Therefore, the
motions to dismiss on this ground will be denied.

**(3) Investor Exemption:**

Defendants Hovnanian and by adoption, First Home Builders,
Logue, and Cabrera (see Doc. #259, p. 23; Doc. #287, ¶108), assert

that plaintiffs were not entitled to a Property Report pursuant to 15 U.S.C. § 1707 because the agreement was exempt under § 1702(a)(7) and 24 C.F.R. § 1710.14(a)(3).  These sections exempt, respectively, the "the sale or lease of lots to any person who acquires such lots for the purpose of engaging in the business of constructing residential, commercial, or industrial buildings or for the purpose of resale or lease of such lots to persons engaged in such business" and the "sale of lots to a person engaged in a bona fide land sales business" from the reporting and disclosure requirements of the ILSFDA.  Defendants concede that "[u]nder normal circumstances, whether a claimant qualifies as an 'investor' for purposes of these exemptions is a question of fact inappropriate to be determined on a motion to dismiss" (Doc. #265, p. 45).  Defendants assert, however, that plaintiffs' "efforts to establish the purported investment scheme allow no alternative but to conclude that [p]laintiffs' purchases fall squarely within [ILSFDA's] investor exemptions."  (Id.)

The HUD Guidelines states, under a section titled, "Lots Sold to Developers":

> The sale or lease of lots to a person who is engaged in a bona fide land sales business is exempt.  For a transaction to qualify for this exemption, the purchaser must be a person who plans to subsequently sell or lease the lot(s) in the normal course of business.

HUD Guidelines, Part IV(b)(3).  As to what constitutes "normal course of business," the HUD Guidelines clarifies, in the same paragraph:

>     The term business refers to an activity of some
>     continuity, regularity and permanency, or means of
>     livelihood. The sale or lease of lots to an individual
>     who is buying the property for investment, to be sold at
>     some unforeseeable time in the future, would not be
>     exempt under this provision. This exemption is available
>     on a lot-by-lot basis, although most transactions would
>     include more than one lot. The entire subdivision need
>     not qualify.

Id.

Here, plaintiffs allege that "[a]lthough it was [their] intention to eventually sell the properties to a tenant procured solely through the efforts of First Home Builders or D&W (and/or their respective officers, employees, and affiliates), none of the [p]laintiffs are engaged in a bona fide land sales business or sell property in the normal course of business, with any continuity, regularity, or permanency, or as a means of livelihood." (Doc. #205, ¶109.) At this stage of the proceedings, the Court finds that dismissal of plaintiffs' ILSFDA claims based upon the investor exemption would be premature. See, e.g., Winter, 777 F.2d at 1450 (finding even summary judgment improper where "[g]enuine issues exist as to . . . whether [buyer] was involved in a land sales 'business,' meaning a continuous, regular, permanent endeavor or a means of livelihood."). Thus, the motions to dismiss on this ground are denied.

**(4) Agency, Individual, and Successor Liability – Kreitner, Robb, Hovnanian, Logue, and Cabrera:**

**(a) Defendant Kreitner – Agency Liability:**

Defendant Kreitner asserts that the ILSFDA claims should be dismissed because she lacked the authority to sell or lease any of the lots at issue and was merely an employee of D&W who acted on behalf of D&W and as an agent of First Home Buyers.  (Doc. #264, p. 17.)  Kreitner states that she did not own any of the lots or have power of attorney from First Home Builders to convey title to any of the lots.  Citing <u>Paquin v. Four Seasons of Tennessee, Inc.</u>,[22] Kreitner claims that she "is similarly situated to the agents described in . . . <u>Paquin</u>.  Essentially, she was a real estate agent working on behalf of D&W to sell pre-construction homes on lots owned by [First Home Builders] but was not herself authorized to sell property.  The authority to sell the property was outside the scope of her agency, and thus, Kreitner was not subject to the disclosure requirements of the ILSFDA."  (Doc. #264, p. 18.)

Section 1701(6) defines "agent," in relevant part, as:

> any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision;

---

[22]519 F.2d 1105 (5th Cir. 1975), <u>superseded by statute</u>, <u>as recognized in</u> <u>Santridian v. Landmark Custom Ranches, Inc.</u>, No. 08-60791, 2008 WL 4571820 (S.D. Fla. Oct. 14, 2008).

15 U.S.C. § 1701(6). The Court finds Kreitner's reliance on <u>Paquin</u> to be misplaced due to several key differences between the cases.[23] Most notably, in <u>Paquin</u>, the court had conducted a bench trial and found that the plaintiffs were in fact provided with a property report (as well as other issues of fact), and that the purported agent was a part-time employee of the developer who merely took plaintiffs on a tour, escorted them to the sales office and answered a generic question.

Here, in Count V and the first 63 paragraphs of the Second Amended Complaint (which are incorporated) plaintiffs allege that: Kreitner acted on behalf of her employer, D&W, and as an agent for First Home Buyers; that she personally participated in the offer to sell the properties by faxing the Prospectus to plaintiffs in February 2005; and that during a March 2005 meeting, she

> orally represented to the Sewells that, consistent with the representations contained in the Prospectus, tenants would be procured by D&W prior to the completion of construction by First Home Builders and the Sewells had 'nothing to worry about' in that regard. Kreitner further represented to the Sewells that the rental payments were 'assured,' and that they *would* receive a 'double-digit' return on their investment. Kreitner also assured the Sewells that, other than their initial down payment for each lot, they would incur no other costs or expenses. She further stated that First Home Builders would make all payments on the underlying construction loan, and that the deposits received from tenants (who would be secured by D&W prior to closing) would cover the Sewell's closing costs, and that the rent received from the tenants would cover the mortgage and all other expenses associated with the lot purchase.

---

[23]The Court assumes, <u>arguendo</u>, that <u>Paquin</u> remains good law after the 1979 amendments to the ILSFDA.

(Doc. #205, ¶¶ 27, 31.)  Plaintiffs' allegations are sufficient to bring Kreitner within the ILSFDA's definition of "agent."  Thus, the Court finds that plaintiffs have adequately pled liability as to Kreitner under Count V.

**(b) Defendant Robb — Individual Liability:**

In his motion to dismiss, defendant Robb asserts that the ILSFDA claims should be dismissed against him because plaintiffs do not allege that he personally violated the ILSFDA.  (See Doc. #285, pp. 7-8; Doc. #258, p. 22.)  According to Robb, plaintiffs have improperly alleged that he, as an officer of First Home Builders, is individually liable under the ILSFDA for the alleged non-disclosure and fraud violations attributable to First Home Builders.  Citing Santidrian v. Landmark Custom Ranches, Inc., 2008 WL 4571820, at *3 (S.D. Fla. 2008) and Parra v. Minto Town Parl, LLC, 2008 WL 4773272, at *2 (S.D. Fla. 2008), Robb claims that an individual does not become personally liable under the ILSFDA without some personal involvement in the sale or offer to sell at issue.

The plaintiffs in Santidrian alleged in their complaint that one of the defendants was liable under the ILSFDA as a developer merely because he was the president, director, and shareholder of the company.  The court in Santidrian, upon dismissing that defendant from the case, noted that "[n]o other allegations of [defendant's] personal involvement in the sale of the property appear in the Complaint . . . . [and defendant was] not alleged to

have any personal involvement in the sale at issue in this case." 2008 WL 4571820, at *3.  The court in that case, however, reached a different decision as to another defendant, who was kept in the case because he was alleged to have personally participated in the process of offering to sell the property as an agent of the developer.  <u>See id.</u>

Here, in Count V of the Second Amended Complaint, plaintiffs allege that Robb was not only a "top-level executive[]" but that he was also "one of the participating planners of the alleged fraudulent investment scheme."  (Doc. #205, ¶115.)  Additionally, allegations of Robb's personal involvement in various aspects of the purported sales scheme are found throughout the first 63 paragraphs of the Second Amended Complaint, which plaintiffs incorporate into Count V.  Thus, the Court finds that at this stage of the proceedings, plaintiffs have adequately pled liability as to defendant Robb under Count V.

### (c) Defendant Hovnanian – Successor Liability:

In its motion to dismiss, defendant Hovnanian asserts that plaintiffs have failed to establish successor liability as to Hovnanian, and that therefore no ILSFDA liability can attach to them on the basis of successor liability.  For the reasons set forth above in the Court's discussion of successor liability, the Court finds that plaintiffs have adequately pled the existence of successor liability.  Thus, defendant Hovnanian's motion to dismiss Count V on the basis of lack of successor liability is denied.

-54-

**(d) Defendants Logue and Cabrera – Adopted Arguments:**

The Court notes that defendant Logue adopts Hovnanian's arguments (<u>see</u> Doc. #259, p. 23) and defendant Cabrera adopts all additional grounds for dismissal asserted by any of the other defendants, as applicable (<u>see</u> Doc. #257, ¶108). For the reasons discussed above, and because the individual allegations as to defendants Logue and Cabrera are sufficient, the motions to dismiss Count V based on adopted grounds are denied.

**B. Count VI – ILSFDA Fraud:**

Plaintiffs allege in Count VI that all of the defendants committed fraud in violation of subsections 1703(a)(2)(A) through (C) of the ILSFDA, 15 U.S.C. §§ 1703(a)(2)(A)-(C). After again incorporating the first 63 paragraphs of the Second Amended Complaint, plaintiffs assert that defendants First Home Builders and D&W (along with their respective principals Robb, Logue, D'Alessandro, and Cabrera) and Kreitner devised and/or implemented the fraudulent scheme alleged throughout the Second Amended Complaint.

"In addition to setting up specific disclosure regulations, the [ILSFDA] also contains a general anti-fraud provision that makes it illegal to obtain money or property in connection with a development by means of a material false statement or any omission of a material fact necessary to make the statements made not misleading." <u>Rice v. Branigar Organization, Inc.</u>, 922 F.2d 788,

791 n.4 (11th Cir. 1991). Subsections 1703(a)(2)(A) through (C) of

the ILSFDA make it unlawful for any developer or agent, directly or

indirectly, to use interstate commerce or the mails--

> (2) with respect to the sale or lease, or offer to sell
> or lease, any lot not exempt under section 1702(a) of
> this title--
>
>> (A) to employ any device, scheme, or artifice
>> to defraud;
>>
>> (B) to obtain money or property by means of
>> any untrue statement of a material fact, or
>> any omission to state a material fact
>> necessary in order to make the statements made
>> (in light of the circumstances in which they
>> were made and within the context of the
>> overall offer and sale or lease) not
>> misleading, with respect to any information
>> pertinent to the lot or subdivision;
>>
>> (C) to engage in any transaction, practice, or
>> course of business which operates or would
>> operate as a fraud or deceit upon purchaser;

15 U.S.C. §§ 1703(a)(2)(A)-(C).

Defendants argue that Count VI of the Second Amended Complaint

should be dismissed for failure to state a claim because plaintiffs

have insufficiently pled fraud under the ILSFDA. In their motion

to dismiss, defendant D&W asserts that plaintiffs have failed to

allege facts establishing fraud with enough specificity in Count

VI, instead "alleging in each count that the 'Defendants' have, as

a group, breached some legal right." (Doc. #260, p. 37.)

Defendant D&W also cites Cook v. Deltona Corp., 753 F.2d 1552 (11th

Cir. 1985), reh'g denied, 763 F.2d 398, to support their contention

that the law of the Eleventh Circuit requires the establishment of

scienter and reliance to state a cause of action for fraud under the ILSFDA. Defendants Kreitner and Cabrera join in this assertion by stating in their respective motions that Count VI should be dismissed for the same reasons that Count III should be dismissed; namely, failure to plead scienter and reliance with requisite specificity (see Doc. #264, p. 19; Doc. #257, ¶104).

Plaintiffs respond in their Opposition that "[w]hile the antifraud provisions of [the ILSFDA] are modeled after the federal securities laws, the critical difference between the two statutory regimes is that a plaintiff is not required to establish either 'scienter' or 'reliance' in order to establish a violation of [the ILSFDA]." (Doc. #273, p. 69.) Rather, plaintiffs assert that they "need only establish a material omission or misrepresentation, however innocent or unintentional by the developer . . . [and that] [q]uestions of intent or negligence are not at issue; once the statement is proven to be 'material,' liability is imposed."

The Court finds no indication in the caselaw that plaintiffs are correct in their interpretation of the statute. The ILSFDA is an anti-fraud statute to which the requirements of Rule 9(b) apply. Degirmenci v. Sapphire-Fort Lauderdale, LLLP, No. 09-60089, 2009 WL 2475457, at *7 (S.D. Fla. 2009). Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001), stated: "Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such

statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." These requirements have not been satisfied as to any defendant in Count VI.

Additionally, in its motion to dismiss, defendant Hovnanian asserts that plaintiffs have failed to demonstrate reasonable reliance on the alleged misrepresentations because they executed the Purchase Agreements, which contains clauses that expressly contradict the purported fraudulent misrepresentations. (See Doc. #265, pp. 48-49.) While plaintiffs have pled reasonable reliance in a conclusory fashion (Doc. #205, ¶127), the Court has found that the Purchase Agreements placed plaintiffs on notice that something was amiss. There are insufficient facts pled which would tend to show reasonable reliance.

In sum, the Court will deny the motions to dismiss as to Count V, but grant the motions to dismiss as to all defendants as to Count VI.

## VI. Breach of Contract - Count VII

After incorporating the first 63 paragraphs of the Second Amended Complaint, plaintiffs allege in Count VII that First Home Builders and D&W "offered plaintiffs . . . an opportunity to purchase investment property as part of the 'First Home Lease

*Purchase Investment Opportunity*' program . . . ."  (Id. at ¶134.)
Plaintiffs allege that they accepted these offers by entering into
the Purchase Agreements for the various properties and paid
consideration pursuant to the terms of the Purchase Agreements.
(Id. at ¶¶ 135-36.)  Plaintiffs allege that First Home Builders and
D&W breached their contractual promise to provide plaintiffs with
the following: (a) a guaranteed tenant; (b) a fourteen percent
(14%) annual rate of return; and (c) no out-of-pocket expenses
other than their initial contract deposit.  (Doc. #205, ¶137.)
Plaintiffs allege that as a consequence, they "suffered substantial
damages, including, but not limited to, the complete loss of their
investment, the possible foreclosure of their investment property
and the prospect of a deficiency judgment rendered against them in
state court proceedings."  (Id. at ¶138.)

        Defendants seek to dismiss the breach of contract claim,
asserting that the unambiguous language of the contracts
establishes that there was no contractual promise to provide
plaintiffs with any of the three things they now claim.  As to
First Home Builders, each Purchase Agreement contained a clause
that disclaimed the terms which plaintiffs now claim were breached:

        Buyer further acknowledges that Builder/Seller had made
        no guarantees that relate to appreciation of the value of
        this home or any other real estate, to the rental rates
        or vacancy factors associated with any real estate, nor
        to the ability to secure renters or subsequent buyers for
        this home or any other real estate.  Buyer states that
        Buyer has conducted adequate research and investigation
        and that the decision to purchase this home was not
        influenced in any part by statements made by

> Builder/Seller with regard to legal, tax, or investment
> considerations . . . .

Since parol evidence is not admissible, defendants assert that
Count VII fails to state a claim upon which relief may be granted.

The Eleventh Circuit, when interpreting contracts under
Florida law, "give[s] effect to the plain language of contracts
when that language is clear and unambiguous." Equity Lifestyle
Props., Inc. v. Fla. Mowing & Landscape Serv., 556 F.3d 1232, 1242
(11th Cir. 2009) (internal quotations and citations omitted).
"[I]f a contract provision is 'clear and unambiguous,' a court may
not consider extrinsic or 'parol' evidence to change the plain
meaning set forth in the contract." Cost Recovery Servs. LLC v.
Alltel Communs., Inc., 259 Fed. Appx. 223, 225-26 (11th Cir. 2007)
(quoting Jenkins v. Eckerd Corp., 913 So. 2d 43, 52 (Fla. 1st DCA
2005)).  Florida law recognizes an exception, however, that may
allow the introduction of parol evidence of an agreement which
induced the execution of the written contract. Johnson Enters. of
Jacksonville, Inc. v. FPL Group, Inc., 162 F.3d 1290, 1309-10 (11th
Cir. 1998).  Thus, because parol evidence may be admissible, the
Court cannot grant the motions to dismiss the breach of contract
claim.

## VII. Breach of Duty of Good Faith and Fair Dealing - Count VIII

In Count VIII, plaintiffs allege that defendants' actions
"constitute a breach of the implied duty of good faith and fair
dealing inherent in every contract by failing to use good faith and

best efforts to procure tenants to rent (and then purchase) the various properties" purchased by plaintiffs (Doc. #205, ¶140).

"Under Florida law, every contract contains an implied covenant of good faith and fair dealing, requiring that the parties follow standards of good faith and fair dealing designed to protect the parties' reasonable contractual expectations." <u>Centurion Air Cargo v. UPS Co.</u>, 420 F.3d 1146, 1151 (11th Cir. 2005) (citation omitted). "A breach of the implied covenant of good faith and fair dealing is not an independent cause of action, but attaches to the performance of a specific contractual obligation." <u>Id.</u> (citation omitted). Accordingly, the Eleventh Circuit has held that "a claim for a breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law in the absence of a breach of an express term of a contract." <u>See, e.g.</u>, <u>id.</u> at 1152 (citations omitted). As the breach of contract count will not be dismissed, Count VIII likewise will not be dismissed.

## VIII. Deceptive and Unfair Trade Practices (FDUTPA) - Count IX

After incorporating the first 63 paragraphs of the Second Amended Complaint, plaintiffs allege in Count IX against all defendants, that their conduct constitutes a violation of the Florida Deceptive and Unfair Trade Practices Act (the "FDUTPA"), FLA. STAT. § 501.201, <u>et seq.</u> Plaintiffs allege that defendants' "scheme to sell real estate based upon their false and fraudulent promises constitutes unfair or deceptive acts or practices in the conduct of any trade or commerce" and that "[s]uch practices are

likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." (Doc. #205, ¶143.) Plaintiffs further assert that defendants' conduct was "willful because they knew or should have known that their conduct was unfair or deceptive or otherwise prohibited by statute or rule" and that plaintiffs "have been damaged as a result of [d]efendants' unlawful and deceptive trade practices." (Id. at ¶¶ 144-45.)

The FDUTPA provides for a civil cause of action for "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," FLA. STAT. § 501.204(1). "A consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." City First Mortg. Corp. v. Barton, 988 So. 2d 82, 86 (Fla. 4th DCA 2008) (internal citations and quotation omitted). See also KC Leisure, Inc. v. Haber, 972 S. 2d 1069, 1073-74 (Fla. 5th DCA 2008). A deceptive act occurs "if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." Zlotnick v. Premier Sales Group, Inc., 480 F.3d 1281, 1284 (11th Cir. 2007) (quoting PNR, Inc. v. Beacon Prop. Mgmt., 842 So. 2d 773, 777 (Fla. 2003)). "This standard requires a showing of probable, not possible, deception that is likely to cause injury to a reasonable relying consumer." Zlotnick, 480 F.3d at 1284 (quotations and citations omitted).

-62-

As to defendants Hovnanian, First Home Builders and Logue, defendant Hovnanian argues (and the remaining defendants join in agreement) that the FDUTPA claims should be dismissed because disclaimers are set forth in the Purchase Agreements, which plaintiffs executed and are charged with having read. Defendants argue that the disclaimers in the Purchase Agreements diminish the probability that a "reasonable consumer" would be deceived and that injury would be caused to a "reasonably relying consumer." See Zlotnick, 480 F.3d at 1284, 1287. In light of the potential admission of parol evidence, however, the Court cannot agree at this stage of the proceedings that the FDUTPA claim should be dismissed.

As to defendants D&W, GDW, Robb, Kreitner, and D'Alessandro, defendants Robb and Kreitner argue (and the remaining defendants join the argument) that plaintiffs' FDUTPA claims should be dismissed because the claims are statutorily precluded by § 501.212(6), which excludes the application of FDUTPA to, among other things, "[a]n act or practice involving the sale, lease, rental, or appraisal of real estate by a person licensed, certified, or registered pursuant to chapter 475, which act or practice violates § 475.42 or § 475.626." FLA. STAT. § 501.212(6). Defendants claim that the statutory exclusion applies to them.

The Second Amended Complaint and the record do not establish that any defendants are persons "licensed, certified, or registered pursuant to chapter 475," as required to invoke the statutory

-63-

exemption set forth in § 501.212(6). Thus, at this "motion to dismiss" stage of the proceedings, the Court does not find that defendants are statutorily exempt from liability under FDUTPA. Therefore, the motions to dismiss on this ground will be denied.

Accordingly, it is now

**ORDERED:**

1. Defendant Samir Cabrera's Motion to Dismiss Second Amended Class Action Complaint (Doc. #257) is **GRANTED in part and DENIED in part.** The motion is granted as to Counts II, III, IV, and VI, and denied as to Counts V and IX.

2. Defendant Bruce A. Robb's Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint (Doc. #258) is **GRANTED in part and DENIED in part.** The motion is granted as to Counts II, III, IV, and VI, and denied as to Counts V and IX.

3. Defendants FHBF Partners, LLP, First Home Builders of Florida I, LLC, and Patrick Logue's Motion to Dismiss the Second Amended Complaint (Doc. #259) is **GRANTED in part and DENIED in part.** As to defendants FHBF Partners, LLP and First Home Builders of Florida I, LLC, the motion is granted as to Counts I, III, and VI, and denied as to Counts V, VII, VIII, and IX. As to defendant Patrick Logue, the motion is granted as to Counts II, III, IV, and VI, and denied as to Counts V and IX.

4.    Defendant D'Alessandro & Woodyard, Inc.'s Motion to Dismiss Second Amended Complaint (Doc. #260) is **GRANTED in part** and **DENIED in part.**  The motion is granted as to Counts I, III, and VI, and denied as to Counts V, VII, VIII, and IX.

5.    Defendant Jan Baillargeon's (as Personal Representative of the Estate of Frank D'Alessandro) Motion to Dismiss the Second Amended Class Action Complaint (Doc. #261) is **GRANTED in part** and **DENIED in part.**  The motion is granted as to Counts II, III, IV, and VI, and denied as to Counts V and IX.

6.    Defendants Gates, D'Alessandro & Woodyard, LLC's Motion to Dismiss the Second Amended Class Action Complaint, and/or in the Alternative, for Summary Judgment (Doc. #263) is **GRANTED in part** and **DENIED in part.**  The motion is granted as to Counts I, III, and VI, and denied as to Counts V, VII, VIII, and IX.  The motion for summary judgment is **DENIED.**

7.    Defendant Honora Kreitner's Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint (Doc. #264) is **GRANTED in part** and **DENIED in part.**  The motion is granted as to Counts III and VI, and denied as to Counts V and IX.

8.    Defendant K. Hovnanian First Homes, LLC's Motion to Dismiss Second Amended Class Action Complaint (Doc. #265) is **GRANTED in part** and **DENIED in part.**  The motion is granted as to Counts I, III, and VI, and denied as to Counts V, VII, VIII, and IX.

9.    Plaintiffs' Unopposed Motion for Leave to Exceed Page Limit in Combined Response to All Pending Motions to Dismiss (Doc. #272) is **GRANTED *nunc pro tunc*.**

**DONE AND ORDERED** at Fort Myers, Florida, this ___10th___ day of September, 2009.

_____
JOHN E. STEELE
United States District Judge


Copies:
Counsel of record